UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DAVID SANTOS                              CIVIL ACTION

VERSUS                                    NUMBER: 11-01527

ROBERT TANNER, WARDEN                     SECTION: "J"(5)


## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(A), presently before the Court is the 28 U.S.C. §2254 application for federal habeas corpus relief of petitioner, David Santos, and the State's response thereto. (Rec. docs. 1, 10). Having determined that an evidentiary hearing is not necessary, it is recommended, for the reasons that follow, that Santos' petition be dismissed with prejudice.

Petitioner Santos is a state prisoner who is presently incarcerated at the Rayburn Correctional Center, Angie, Louisiana. On June 20, 2007, Santos was found guilty of forcible rape after trial, by jury, in the Criminal District Court for the Parish of

Orleans, State of Louisiana. On August 10, 2007, Santos was sentenced to twenty-five years at hard labor in the custody of the Louisiana Department of Corrections with credit for time served. Santos' conviction was affirmed by the Louisiana Fourth Circuit Court of Appeal on October 8, 2008. State v. Santos, 993 So.2d 377, 2008 WL 4684663 (La. App. 4th Cir. 2008)(table). Writs were denied by the Louisiana Supreme Court on June 5, 2009. State v. Santos, 9 So.3d 868 (La. 2009). Santos' conviction became final ninety days later, or September 3, 2009, when the time for seeking a writ of certiorari from the U.S. Supreme Court expired and no application therefor was made. See U.S. Sup. Ct. R. 13(a); Roberts v. Cockrell, 319 F.3d 690, 694 (5th Cir. 2003).

On February 5, 2010, some one hundred fifty-four days after his conviction had become final, Santos signed and dated an application for post-conviction relief that contained the same claims for relief that he urges herein. That application was denied by the state trial court on February 9, 2010. Santos' subsequent writ applications to the Louisiana Fourth Circuit Court of Appeal, State v. Santos, No. 2010-K-0430 (La. App. 4th Cir. Apr. 20, 2010)(unpublished order), and to the Louisiana Supreme Court, State ex rel. Santos v. State, 63 So.3d 970 (La. 2011), met similar fates. It thus appears that Santos' habeas petition was timely-filed under 28 U.S.C. §2244(d) and that available state court

2

remedies have been exhausted as required by 28 U.S.C. §2254(b)(1)(A).

Santos is now before the Court seeking federal habeas relief on the claims that he frames as follows:

1.  [w]hether relator's Sixth Amendment and Article I §16 rights to confrontation and cross-examination were improperly abridged?

2.  [w]hether the trial court used the proper standard to determine whether the verdict was contrary to the law and evidence in this case?

3.  [w]hether the State-appointed interpreter was duly qualified according to the strictures of La. C.E. Art. 604?

4.  [w]hether relator was denied effective assistance of counsel prior to and during the trial on the merits?

(Rec. doc. 1, pp. 5, 11, 18).

To facilitate a resolution of petitioner's claims, the Court recalls the lengthy recitation of facts that were established at his trial as set forth by the Louisiana Fourth Circuit in the context of Santos' direct criminal appeal, as follows:

> Det. Alicia Wright testified that in May 2006 she was assigned to the New Orleans Police Department's Sex Crimes Unit. She testified that on May 17, 2006, she responded to a call concerning a rape victim who was being examined at the Medical Center of Louisiana, which at the time was housed in the New Orleans Center. There, she met the victim, A.E. Det. Wright testified that A.E. spoke no English, but a fellow officer, Ofc. Louis Rivas, translated for A.E. Det. Wright testified that when she interviewed A.E., A.E.

was lying on her side in a bed because of pain in her genital area. Det. Wright testified that A.E. told her that she had arrived in New Orleans at 11:00 p.m. the night before and had gone to the home of her childhood friend, whom she identified as the defendant, David Santos, Det. Wright testified that A.E. told her that she had known Santos for many years in their native Honduras, and he had convinced her to come to New Orleans to make money. Det. Wright testified that A.E. told her that after she arrived at Santos' house at 2241 Kraft Place, she saw several men sleeping on the floor in the common areas of the house. A.E. told Det. Wright that she and Santos went into a bedroom and talked of their childhood in Honduras.

Det. Wright testified that A.E. told her that at some point, Santos told her that he had always liked her, and he told her he wanted to have sex with her. A.E. testified that she told him that if that was the reason he brought her to New Orleans, she was leaving. A.E. testified to Det. Wright that a man came into the room, saw them inside, and left. A.E. told Det. Wright that at that point, both she and Santos were lying fully-clothed on beds in the room, and Santos came up to her and put his hand over her mouth and nose. A.E. testified that Santos' hand was wet, and she passed out. A.E. testified that when she woke up the next morning, she was naked and was bleeding from her vagina. In addition, her anal area was sore. A.E. told Det. Wright that Santos was lying next to her. She testified that Santos told her that he did not do anything to her. A.E. told Det. Wright that Santos left for work and returned that evening. At that time, Santos allowed A.E. to use his cell phone to call her brother-in-law, who lived in the area. A.E. told her that her brother-in-law picked her up and took her to his house, where he notified his neighbor, whose brother was Ofc. Rivas.

Det. Wright testified that she, Ofc. Rivas, and other officers went to the Kraft Place address, where they found Santos and other men. She testified that the officers interviewed the men, and she arrested Santos, handcuffed him, and advised him of his rights. She testified that in response to her question as to whether Santos wanted to give a statement, he told her that he brought A.E. to New Orleans because she was his woman, and he insisted that they had had consensual sex. Det. Wright testified that Ofc. Rivas translated for Santos and the other men at the residence. She testified that one of the other men present was Pablo Sandoval, who identified himself as Santos' brother and testified that when he was in the room with Santos and A.E. during part of the previous night, nothing happened between them. Det. Wright testified that she obtained a search warrant for the residence, and pursuant to this warrant she seized a red bandana from the window sill in the bedroom. Det. Wright identified the clothing seized from A.E. at the hospital. Det. Wright testified that she also searched a van at the residence a few days later when she learned from one of the men at the residence that ether might be in the van, but she found nothing in the van.

Det. Wright testified that A.E. was crying and in pain when she interviewed her at the hospital. She testified that A.E. told her that she did not contact the police sooner because Santos had threatened to harm her family in Honduras. A.E. also told her that Santos threatened to kill her if she told her brother-in-law what had happened.

On cross-examination, Det. Wright testified that when confronted, Santos claimed to be a member of Saddam Hussein's family and claimed to have taken part in the 9-11 attacks on New York City and the Pentagon. She testified that she did not believe that any of the other

men staying at the house were involved in the rape. She also testified that she received no test results from A.E.'s clothing. She testified that Santos' brother also testified that A.E. was Santos' girlfriend.

Ofc. Louis Rivas testified that he was fluent in Spanish. He testified that on May 17, he got a call from his brother, who told him that a neighbor had come to his house with a woman who alleged she had been raped. Ofc. Rivas testified that less than an hour later, he went to his brother's house in Gretna where he met with A.E. and her brother-in-law, who was the neighbor of Ofc. Rivas' brother. A.E. told him that she had arrived in New Orleans the day before, brought here by Santos, who also went by the name of Donald Sandoval, and who was a childhood friend from Honduras. She told Ofc. Rivas that Santos told her he was making a lot of money and wanted her to come here to make money as well. Ofc. Rivas testified that A.E. told him that after she arrived at Santos' house, they spoke of Honduras, and then Santos told her he had always had a crush on her and wanted to have sex with her. A.E. told Ofc. Rivas that she refused to have sex with Santos, and he then placed his hand over her mouth and nose, and she passed out.

Ofc. Rivas testified that when she woke up the next morning, she was naked, bleeding, and in pain. She testified that Santos told her that she must be having her period, but she pointed out that she had had a hysterectomy. She testified that Santos left the house to go to work, warning her not to call anyone or he would harm her or her family in Honduras. Ofc. Rivas testified that A.E. told him that when Santos returned that home that evening, he let A.E. use his cell phone. She testified that she called her brother-in-law, who picked her up and took her to his house. Ofc. Rivas testified that after A.E. told him what had

happened, she and her brother-in-law directed him to the house where she alleged the attack happened. He testified that during the ride, A.E. was sitting sideways because she was in pain. Ofc. Rivas testified that he then took A.E. to the Fourth District police station, and then to the hospital where he translated for A.E. when she met with Det. Wright. Ofc. Rivas testified that he remained with A.E. until he left the room while she was being medically examined. He then went with Det. Wright and other officers to Santos' house, where he again translated for the men there who could not speak English. He testified that he remained outside talking to Santos and the other men while other officers executed the search warrant. He testified that he advised Santos of his rights in Spanish, and Santos told him that A.E. was his girlfriend and that they had had consensual sex.

On cross-examination, Ofc. Rivas testified that A.E. told him at some point that Santos had been her best friend, but she had not been in contact with him for fifteen years prior to his calling her in Texas to invite her to come to New Orleans. He testified that A.E. never told him that Santos had told her that other women would be staying in the house. He insisted that he translated the rights to arrested form to Santos before Santos signed it. On redirect, Ofc. Rivas explained that as a traffic officer, he had translated such forms thousands of times while making DWI arrests.

Joan Rooney testified that she worked as a sexual assault examiner at the Medical Center of Louisiana in New Orleans. Qualified as an expert, she testified that she examines rape victims, collects forensic evidence from sexual assault victims, and takes statements from them. She testified that she examined A.E. in May 2006. At that time, A.E. was upset and crying, and she was lying on her

side on the examination bed, complaining of pain in her vagina and on her external genitalia. Ms. Rooney testified that she found several locations where A.E. had injury and tenderness, including on her right breast, in her vaginal canal, on her outer genitalia, and in her anus. She testified that the injuries to A.E.'s vagina were not consistent with blunt force trauma, such as that inflicted by a penis, but rather were consistent with those possibly made by a fingernail or something else sharply inserted there. Ms. Rooney testified that A.E. was bleeding, even though A.E. told her that she had had a hysterectomy. Ms. Rooney testified that she also spoke Spanish, and A.E. told her that she had been brought to New Orleans by an acquaintance who told her she could find work. A.E. told Ms. Rooney that she had arrived late at that person's house, and there were people sleeping on the floor in several of the rooms. A.E. told her that she and the person who had brought her to New Orleans were in a room talking when that person put a rag over her face. A.E. told her that when she awoke the next day, she had pain in her genital area. Ms. Rooney testified that A.E. told her that the man said he would kill her if she told anyone what happened. Ms. Rooney testified that she gave A.E. an antibiotic, pain medication, and a hepatitis B vaccination.

On cross-examination, Ms. Rooney testified that although a doctor was present when A.E. was examined, generally the physician does not write a separate evaluation. Ms. Rooney testified that it was possible that A.E.'s injuries were a day old, but it was unlikely that they were two days old. She testified that she had no knowledge of the results of the rape kit that was taken from A.E. On redirect, Ms. Rooney testified that A.E. told her that she had showered and changed her clothes before contacting the police.

Via an interpreter, A.E. testified that she knew Santos in Honduras, but she had not seen him for fifteen to twenty years. She testified that she was living in Houston, and Santos called her and convinced her to come to New Orleans where she could get a job in housekeeping making more money than she was making in Houston. A.E. testified that Santos told her that she could live at his house, where other workers and their women also lived. She testified that Santos arranged for her ride to New Orleans. When she arrived, she only saw Santos, his brothers, and other men at the residence, but she thought the other women he mentioned were not there because they were working. She testified that she went through the living room into the kitchen, where she sat talking to Santos and his brothers about Honduras. She testified that Santos then took her into a room that had two beds and told her that this was where she would sleep. She testified that Santos went out of the room to get a drink, and she shut the door and locked it. She testified that she lay down on the bed to pray, then she changed into a T-shirt and shorts and went to sleep. She testified that she awoke around midnight when she felt a hand on her. She testified that she did not fully awaken, but she could hear Santos' voice, and he put his hand over her mouth and nose. She testified that Santos' hand was wet, and she could smell a strong odor on his hand. A.E. testified that when she awoke the next morning around 4:00 a.m., she was bleeding from her vagina and was in a lot of pain. She testified that she began crying, and Santos told her that she had been "real pretty" the night before. She testified that she did not tell Santos she was bleeding.

A.E. testified that before Santos left for work, he told her that something could happen to her family in Honduras if she told anyone what happened. She testified that Santos also

refused to allow her to use his cell phone before he left for work. However, after he returned that evening, he allowed her to use his cell phone to call her brother-in-law. She testified that her brother-in-law picked her up and took her to his house, where she told him what happened. She testified that she later spoke with a policeman, and she showed him where Santos lived. She testified that the officer then took her to the police station and then to the hospital, where she met a female officer. She testified that a nurse examined her at the hospital where she insisted she was still in a lot of pain.

On cross-examination, A.E. testified that she came to New Orleans of her own free will. She testified that although Santos told her that other women were living at his house, she would not have to pay rent there because she would be able to get a housekeeping job where she would be allowed to live. She testified that she had never been to New Orleans before, and the only people at Santos' house spoke Spanish. She denied being naked when she awoke, insisting that she was wearing a different pair of shorts when she awoke from those she was wearing when she went to sleep. She testified that she remained inside all day when Santos was at work because she could not open the door, but she admitted that she did not tell the police she was trapped inside the residence. She testified that Santos had never threatened her before this incident, and he did not harm her family. She also testified that Santos told her that he was a member of Saddam Hussein's family and had participated in the 9-11 attacks.

Also via an interpreter, David S. Santos testified and denied raping A.E., contending that any sexual activity between them was consensual. He testified that although they had known each other in Honduras, they had not spoken for twenty-four years. He testified

that he contacted A.E. while she was in Houston, and although they started out as just friends, their relationship developed into one of girlfriend/boyfriend. He testified that A.E. agreed to come to New Orleans because she had been working in Houston for a family that was leaving the country. He testified that his brother and another man drove A.E. to New Orleans, and they arrived at 11:45 p.m. on May 14, 2006. He testified that A.E. stayed with him for a few days. At first, he, A.E., and his two brothers shared a room, but then the brothers left the room. He testified that A.E. changed clothing in front of him, modeling underwear for him.

Santos testified that A.E. got angry at him soon thereafter because he was speaking with his sister on this cell phone concerning a lost money order he had sent her, and A.E. assumed that he was speaking with an ex-girlfriend. He testified that A.E. grabbed the phone from him. He maintained that he did not rape A.E.; rather, they engaged in consensual sex.

On cross-examination, Santos testified that he and A.E. became romantically involved two months before she came to New Orleans. He testified that many people knew they were a couple, and she had free access to his cell phone while she was in New Orleans. He testified that they had argued late on the evening of May 16th, when she became convinced that he was speaking with an ex-girlfriend, with whom he has a child. At that point, she called her brother-in-law to come and get her and told Santos that he would regret what he was doing. He testified that there were no other women in the house. He testified that the bedroom where A.E. slept had two beds, but his brothers did not sleep in that bedroom. He testified that the police came to his house at approximately 2:00 a.m., on May 18th, and at that time he told them that A.E. was his

girlfriend. He denied telling her that he was
related to Saddam Hussein or that he was
involved in the 9-11 attacks. He also denied
threatening to harm A.E. or her family.

<u>Santos</u>, 993 So.2d 377, 2008 WL
4684663 at *1-5 (footnote
omitted).

Petitioner's first claim for relief is that his Sixth
Amendment rights to confrontation and cross-examination were
violated in various respects. Before turning to the specific
instances complained of by Santos, the Court will briefly discuss
the law governing such Sixth Amendment violations.

The Confrontation Clause of the Sixth Amendment guarantees a
criminal defendant the right to cross-examine the witnesses against
him and bars the admission of testimonial hearsay. <u>Crawford v.
Washington</u>, 541 U.S. 36, 59, 124, S.Ct. 1354, 1369 (2004). Police
officers thus cannot, through their trial testimony, refer to the
substance of statements given to them by nontestifying witnesses in
the course of their investigation when those statements inculpate
the defendant. <u>Taylor v. Cain</u>, 545 F.3d 327, 335 (5th Cir. 2008).
The Confrontation Clause prohibits the admission of out-of-court
testimonial statements unless the witness is unavailable and the
defendant has had a prior opportunity to cross-examine the witness.
<u>United States v. Acosta</u>, 475 F.3d 677, 680 (5th Cir. 2007). Only
testimonial statements cause a declarant to be a witness within the

12

meaning of the Confrontation Clause and a statement that is not testimonial is not violative of the Constitution. <u>Davis v. Washington</u>, 547 U.S. 813, 821, 126 S.Ct. 2266, 2273 (2006); <u>United States v. Vasquez</u>, 234 Fed.Appx. 310, 313 (5th Cir. 2007). A testimonial statement was described by the Supreme Court in <u>Crawford</u> as a "solemn declaration or affirmation made for the purpose of establishing as proving some fact" including "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." <u>Crawford</u>, 541 U.S. at 51-52, 124 S.Ct. at 1364 (internal quotations omitted). At a minimum, the term "testimonial" applies to "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." <u>Id</u>. at 68, 124 S.Ct. at 1374.

Even where a Sixth Amendment violation has occurred, federal habeas relief is appropriate only if the admission of the challenged testimony had a "'substantial and injurious effect or influence in determining the jury's verdict'", the so-called harmless error analysis. <u>Taylor</u>, 545 F.3d at 335 (quoting <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623, 113 S.Ct. 1710, 1714 (1993)). The factors to be considered in determining whether a state trial evidentiary error was harmless include the importance of the witness' testimony, whether the testimony was cumulative, the

13

presence or absence of evidence corroborating or contradicting the witness' testimony on material points, the extent of the cross-examination permitted, and the overall strength of the prosecution's case. Hafdahl v. Johnson, 251 F.3d 528, 539-40 (5th Cir.), cert. denied, 534 U.S. 1047, 122 S.Ct. 629 (2001). For the reasons that follow, the Court believes the admission of the testimony challenged by Santos did not run afoul of the Constitution.

The first set of testimony complained of by Santos came from Officer Rivas who relayed "... statements of [the victim's] brother-in-law, Louis Salava, who allegedly picked her up, identified [defendant's] residence, [and] notified [Officer] Rivas that [the victim] had been raped." (Rec. doc. 1, p. 19). Through lengthy testimony that was given on direct examination, Officer Rivas testified to the actions that he took in response to a phone call from his brother who reported the incident in question. (Trans. of June 20, 2007, pp. 3-20). However, the report and the actions in leading Officer Rivas to the defendant's residence were attributed to both the victim and the victim's brother-in-law with the majority of the information being relayed to the officer by the victim herself. (Id. at p. 8). As the victim testified at trial and was subject to cross-examination by the defense, to the extent that any of the information that was relayed to Officer Rivas came

solely from the victim's brother-in-law, it was cumulative of the testimony of the victim. Moreover, by the time that the officer's testimony was elicited at trial, the jury had already been read the bill of information and was thus well aware of the victim's accusation that she had been subjected to a sexual assault. At trial, Santos admitted to having sex with the victim but claimed that it was consensual. The jury was thus called upon to reconcile the victim's account of the incident, which resulted in significant physical injuries, with that of the petitioner which offered no explanation whatsoever for those injuries. After hearing the witnesses' testimony, the jury deliberated for all of thirty-six minutes before returning its guilty verdict. (St. ct. rec., vol. 1 of 7, minutes of June 20, 2007). A review of the jurors' polling slips reflects that their verdict was unanimous. (St. ct. rec., vol. 2 of 7).

When called upon to do so in the context of Santos' direct criminal appeal, the Louisiana Fourth Circuit readily concluded that the evidence presented at Santos' trial was sufficient to sustain a conviction for forcible rape, citing controlling state jurisprudence that the testimony of the victim alone suffices. Santos, 993 So.2d 377, 2008 WL 4684663 at *7. That conclusion is entitled to great weight here. Poretto v. Stalder, 834 F.2d 461, 467 (5th Cir. 1987). In light of the overwhelming evidence of

petitioner's guilt, to the extent that any of Officer Rivas' testimony was attributable solely to statements made to him by the victim's brother-in-law, any such error was harmless.

The second set of testimony deemed objectionable by Santos came from Detective Wright who relayed information from "Pablo Sandoval, relator's brother, who allegedly informed the officers that he was in the room, saw nothing incriminating, but heard the two arguing and that they were girlfriend and boyfriend." (Rec. doc. 1, p. 19.). In the first portion of that testimony Detective Wright was actually recalling something that had been told to her by the victim rather than Pablo Sandoval. (Trans. of June 19, 2007, p. 6). Here, again, because the victim testified at trial and was subjected to cross-examination by the defense, no Sixth Amendment violation is apparent. In addition, inasmuch as the statements that were attributed to Pablo Sandoval did not inculpate petitioner, the Crawford proscription was not implicated. (Id. at p. 11).

Although he provides no cite to the trial transcript, the third set of objectionable testimony complained of by Santos was "[t]he testimony of [Detective] Wright as relative to the red bandana, which was seized by C. Smith, a crime lab technician ...." (Rec. doc. 1, p. 19). A close reading of Detective Wright's testimony, however, reveals that although one "C. Smith" of the

Crime Lab Unit had logged the envelope containing the red bandana into evidence, the bandana had actually been located by the detective herself in the course of executing the search warrant she had obtained. (Trans. of June 19, 2007, pp. 15-17). As Detective Wright testified at trial and was subject to cross-examination, the Confrontation Clause was not offended. Even if the bandana had been found by the crime lab technician rather than the detective, that circumstance alone can hardly be thought of as a "statement" prohibited by Crawford. Moreover, Detective Wright would admit on cross-examination that there was no scientific evidence linking the bandana to the crime or to the petitioner. (Id. at 25-26). The mere discovery of the bandana was thus not inculpatory.

Santos next complains of additional testimony from Detective Wright to the effect that a van located outside the petitioner's residence had been searched several days after his arrest in response to a statement made by one of the individuals at the residence that there was possibly ether in the van that they used for construction purposes. (Rec. doc. 1, pp. 19-20). On both direct and cross-examination, Detective Wright readily admitted that no ether was found in the van and there was no proof that ether had ever been present in the van or the residence where the assault occurred. (Trans. of June 19, 2007 at pp. 21, 26, 34-35). As no ether was discovered much less linked to Santos, the pre-

search statement suggesting that it was present did not directly inculpate petitioner and the uncorroborated tip and its possible presence was offered more to explain the investigating officers' actions. No constitutional violation has been established here.

Finally, much like the first set of testimony complained of by Santos as violative of the Sixth Amendment, petitioner alleges that his confrontation rights were abridged when Officer Rivas testified that he had received a call from his brother stating that the brother's neighbor, who was the victim's brother-in-law, had alerted him that the assault had occurred. (Rec. doc. 1, p. 20). Here, again, the testimony that Santos complains of was cumulative to that which was given by the victim who was thoroughly cross-examined by the defense. (Trans. of June 20, 2007, pp. 4-5, 8-9, 21-24). At the start of petitioner's trial, the jury was undoubtedly informed that the charge against the defendant was nothing more than an accusation which the State was required to prove beyond a reasonable doubt. By the time that Officer Rivas took the stand, the jury was well aware of that accusation. The only issued to be resolved at petitioner's trial was that of consent and on that issue the testimony of the victim and the circumstantial evidence that was presented was overwhelming. To the extent that there was a Sixth Amendment violation, any error following therefrom was harmless. The state courts' resolution of

Santos' Sixth Amendment claim was not so unreasonable so as to justify the granting of federal habeas corpus relief.  28 U.S.C. §2254(d); <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 1523 (2000); <u>Montoya v. Johnson</u>, 226 F.3d 399, 403-04 (5th Cir. 2000), <u>cert</u>. <u>denied</u>, 532 U.S. 1067, 121 S.Ct. 2220 (2001).

Santos' second and third claims for relief draw on a common theme and will thus be addressed together.  In his second claim for relief, petitioner candidly "... frames ... the claim[] as an error by [the] trial court ... in the employment of an improper standard of law for new trial under Louisiana Code of Criminal Procedure Article 851(1)(trial court shall grant a new trial when the verdict is contrary to the law and the evidence)." (Rec. doc. 1, p. 30). Santos argues that the trial court's summary denial of his motion for new trial was in error when weighed against the State's evidence and was contrary to its obligation to review the evidence under the "thirteenth juror" standard that is imposed by state law. (<u>Id</u>.).  In his third claim for relief, petitioner argues that the interpreter who was utilized at his trial lacked the qualifications required by Article 604 of the Louisiana Code of Evidence. (Rec. doc. 1, p. 38).

In addressing Santos' second claim for relief, the Court initially notes that the trial court's minutes from the August 9, 2007 hearing on petitioners's motions for new trial and for post-

verdict judgment of acquittal reflect only that those motions were "denied." (St. ct. rec., vol. 1 of 7). The Court is directed to no written reasons upon which those rulings were based nor to a transcript of the proceedings of August 9, 2007, absent which the Court is unable to say whether the standard that was utilized by the trial judge was the appropriate one under state law or not. Although a federal habeas court, when called upon, is empowered to review the sufficiency of the evidence supporting a petitioner's conviction, <u>Guzman v. Lensing</u>, 934 F.2d 80, 82 (5th Cir. 1991), that exercise does not include a review of the weight of the evidence or the credibility of witnesses. <u>United States v. Young</u>, 107 Fed.Appx. 442, 443 (5th Cir. 2004)(citing <u>United States v. Garcia</u>, 995 F.2d 556, 561 (5th Cir. 1993)). This is so because "[a]ll credibility choices and conflicting inferences are to be resolved in favor of the verdict." <u>Ramirez v. Dretke</u>, 398 F.3d 691, 695 (5th Cir. 2005). A mere challenge to the weight of the evidence thus fails to rise to a level of constitutional magnitude.

More importantly, however, although Santos frames his second and third claims for relief as alleged errors on the part of the trial court, the proper inquiry here is not whether the trial court erred or whether state law has been transgressed but whether there has been a violation of the petitioner's constitutional rights. 28 U.S.C. §2254(a); <u>Engle v. Issac</u>, 456 U.S. 107, 102 S.Ct. 1558

(1983); <u>Bailey v. Procunier</u>, 744 F.2d 1166, 1168 (5th Cir. 1984). A federal habeas court does not sit as a "super" state supreme court to review mere errors of state law. <u>Wood v. Quarterman</u>, 503 F.3d 408, 413-14 (5th Cir. 2007), <u>cert</u>. <u>denied</u>, 552 U.S. 1314, 128 S.Ct. 1874 (2008). Regardless of what standard the trial judge utilized in resolving petitioner's motion for new trial, because the Louisiana Fourth Circuit and the Louisiana Supreme Court, in the context of Santos' direct criminal appeal, properly reviewed the sufficiency of the evidence that was presented at his trial under the standard enunciated in <u>Jackson v. Virginia</u>, 443 U.S. 307, 99 S.Ct. 2781 (1979), no constitutional violation is apparent. And, as respects Santos' third claim, "[r]ulings on the appointment and qualifications of an interpreter do not reach constitutional proportions." <u>Fairbanks v. Conan</u>, 551 F.2d 97, 99 (6th Cir. 1977). Santos' second and third claims are without merit.

Petitioner's fourth and final claim herein is that he was denied the effective assistance of counsel in several respects. To merit relief on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated by the Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984), by demonstrating that: (1) counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. The burden of proving either element of

Strickland is a heavy one and if proof of one element is lacking, the Court need not consider the other. Id. at 697, 104 S.Ct. 2069. Morever, "[i]f the facts adduced at trial point so overwhelmingly to the defendant's guilt that even the most competent attorney would be unlikely to have obtained an acquittal, then the defendant's ineffective assistance claim must fail." Green v. Lynaugh, 868 F.2d 176, 177 (5th Cir.), cert. denied, 493 U.S. 831, 110 S.Ct. 102 (1989). In evaluating allegations of ineffectiveness, the Court must be mindful of the strong presumption that counsel's actions or inactions were part of a sound trial strategy. Murray v. Maggio, 736 F.2d 279, 282 (5th Cir. 1984); Boyd v. Estelle, 661 F.2d 388, 390 (5th Cir. 1981). Much like the standard of review of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as codified in §2254(d), Strickland imposes a highly deferential standard ".... and when the two apply in tandem, review is 'doubly' so." Harrington v. Richter, ___ U.S. ____, ____, 131 S.Ct. 770, 788 (2011)(quoting Knowles v. Mirzayance, 556 U.S. 111, 123, 129 S.Ct. 1411, 1420 (2009)).

Before turning to the specific instances of ineffectiveness alleged by Santos, the Court pauses to recall the daunting task that trial counsel faced at the time that the he was engaged to represent petitioner. Strickland, 466 U.S. at 690, 104 S.Ct. at 2066 (reasonableness of counsel's actions is viewed as of the time

of counsel's conduct). By the time that he became involved in the case, defense counsel's strategic options had already been greatly reduced by Santos' voluntary statements to the police that he had engaged in sex with the victim but that it had been consensual. Suggesting that someone else was the assailant was thus a dubious strategy. Counsel was therefore left to rely upon such tactics as, for example, pointing out that certain information contained within Detective Wright's police report had not been obtained directly by her but had instead been relayed through Officer Rivas. (Trans. of June 19, 2007, p. 23). As to other information, such as the presence of ether, counsel was able to demonstrate to the jury that it simply had no factual basis and he also emphasized that the red bandana that was located at the scene had not been scientifically linked to petitioner. (Id. at pp. 25-26). In addition to challenging the accuracy of Detective Wright's report, counsel brought to the jury's attention the fact that an individual who had provided information to her could have been subpoenaed by the State to testify at trial. (Id. at pp. 40-41). Against this non-exclusive backdrop, the Court now turns to the deficiencies complained of by petitioner.

Santos first complains that counsel failed to adequately cross-examine the victim regarding purported inconsistencies between her trial testimony and statements that were attributed to

her in Detective Wright's police report. As noted by the Louisiana Fourth Circuit in passing upon Santos' direct criminal appeal, "... these police reports were not introduced at trial and thus were not considered by the jury." Santos, 993 So.2d 377, 2008 WL 4684663 at *8. The only exception to that was the defense's introduction of the last part of the detective's narrative which contained a notation that the case was no longer open and had been cleared upon Santos' arrest. (Trans. of June 19, 2007, pp. 32-34). A fair reading of the trial transcript reveals that this line of questioning was a strategic choice to emphasize to the jury that the accusation contained within the police report did not equate with a finding of guilt. (Id.).

As was also noted by the Louisiana Fourth Circuit, via defense counsel's questioning, the jury was made aware of various testimonial discrepancies but still chose to believe the victim's version of events. Santos, 993 So.2d 377, 2008 WL 4684663 at *8. Through the testimony of Detective Wright and Officer Rivas, it had already been established that the victim had arrived in New Orleans late in the evening on May 16, 2006 and the "Alleged Sexual Assault Data Form" that was admitted into evidence demonstrates that the victim presented to the hospital for treatment on May 17, 2006 at 11:16 p.m. (St. ct. rec., vol. 4 of 7). Santos' assertion that the injuries were two days old thus lacks factual support. Based upon

petitioner's initial interview with police in which he claimed that his sex with the victim was consensual and his trial strategy of contending that the accusation was the product of perceived jealousy, suggesting that the victim had sustained her significant injuries while in the company of her brother-in-law was not a particularly viable option. Counsel cannot be said to have completely and entirely failed to subject the prosecution's case to meaningful adversarial testing in light of what he was presented. Bell v. Cone, 535 U.S. 685, 696-98, 122 S.Ct. 1843, 1851-52 (2002).

Santos' second specification of ineffectiveness is that counsel failed to adequately cross-examine the victim regarding their alleged argument after she perceived that he was talking on the phone with an ex-girlfriend rather than his sister. Petitioner complains that counsel failed to contact his sister to verify, and presumably to have her testify, that the alleged conversation did in fact take place.

Santos' strategy at trial was that the victim, driven by jealousy over her perception that the petitioner was talking to an ex-girlfriend, fabricated the rape. The actual participant to the phone call petitioner allegedly made or its subject matter are irrelevant to the victim's perception of who Santos was actually conversing with. As it was, counsel was allowed to present this defense through the direct testimony of the petitioner which

25

largely went unassailed. The jury was thus called upon to determine whether the victim's or Santos' version of the events was the more credible one. However, as Santos gave no testimony and offered no plausible explanation to account for the victim's significant injuries, the jury's credibility choice was quite understandable. To the extent that Santos' specification can be read as alleging that counsel failed to secure the presence of his sister to testify at trial, he fails to demonstrate that she was, in fact, available to testify and that her testimony would have been favorable. Gregory v. Thaler, 601 F.3d 347, 352-53 (5th Cir. 2010)(citing Alexander v. McCotter, 775 F.2d 595, 602 (5th Cir. 1985)). In any event, the testimony of Santos' sister would have been subject to challenge on the basis of bias. Sholes v. Cain, 2008 WL 2346151 at *15 (E.D. La. June 6, 2008), aff'd, 370 Fed.Appx. 531 (5th Cir.), cert. denied, ____ U.S. ____, 131 S.Ct. 292 (2010); Talley v. Cain, 2009 WL 916331 at *11 (E.D. La. April 6, 2009). Deficient performance and prejudice are not apparent here.

Next, petitioner faults counsel for failing to interrogate the victim as to whether she had been drinking prior to the sexual assault such that her judgment and her ability to recall the events that transpired were impaired. Other than Santos unsupported assertion in this regard, the record contains no evidence of the

victim having consumed any alcoholic beverages before the rape occurred. To the contrary, the "Alleged Sexual Assault Data Form" indicates that no medications, drugs, or alcohol were consumed by the victim before or after the assault. (St. ct. rec., vol. 2 of 7, form at p. 2). At trial, Santos testified on his own behalf and he was in no way foreclosed from offering testimony as to the victim's consumption of alcoholic beverages if he so chose. Counsel is not ineffective for failing to pursue lines of inquiry which have no factual support.

In his next specification of alleged ineffectiveness Santos contends that his attorney erred in failing to challenge the qualifications of the interpreter who was utilized at his trial in accordance with Article 604 of the Louisiana Code of Evidence. As noted by the State, Santos points to nothing that was known by counsel prior to trial that would have alerted him to question the interpreter's qualifications before she took the stand. Under Louisiana law, an interpreter need only translate with general accuracy. State v. Gonzales, 973 So.2d 115, 1117 (La. App. 4th Cir. 2007), writ denied, 983 So.2d 1271 (La. 2008)(citing State v. Rodriquez, 635 So.2d 391 (La. App. 4th Cir. 1994), writ denied, 678 So.2d 33 (1996)). The testimonial excerpts cited by Santos do not demonstrate how the allegedly insufficient translations prejudiced the defense, particularly as it relates to the discrete issue of

the victim's consent.  Perez v. Cain, 2008 WL 108661 at *27 (E.D. La. Jan. 8, 2008), aff'd, 529 F.3d 588 (5th Cir.), cert. denied, 555 U.S. 995, 129 S.Ct. 496 (2008).  Based upon a review of the trial transcript as a whole, petitioner was not hampered in presenting the defense that he did based upon any translation deficiencies. Counsel was therefore not ineffective for failing to challenge the interpreter's qualifications more vigorously nor was Santos prejudiced thereby.

Santos next complains that his attorney failed to interview the seven "witnesses" who were involved in the events surrounding his rape of the victim.  Although these individuals were not called at trial, Santos alleges that they were effectively allowed to testify through the testimony of Detective Wright and Officer Rivas whose information "exceeded the scope of what was required to give an accurate account of the officer's [sic] involvement here." (Rec. doc. 1, p. 52).

While Strickland teaches that "... counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary", counsel's strategic decision not to conduct further investigation are entitled to considerable deference. Strickland, 466 U.S. at 691, 104 S.Ct. at 2066; Foster v. Johnson, 293 F.3d 766, 778 (5th Cir.), cert. denied sub nom., 537 U.S. 1034, 123 S.Ct. 625 (2002).  "Defense counsel is

not required to 'investigate everyone whose name happens to be mentioned by the defendant.'" <u>Schwander v. Blackburn</u>, 750 F.2d 494, 500 (5th Cir. 1985)(quoting <u>United States v. Cockrell</u>, 720 F.2d 1423, 1428 (5th Cir. 1983), <u>cert</u>. <u>denied</u>, 467 U.S. 1251, 104 S.Ct. 3534 (1984)).  A habeas petitioner "'who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial'". <u>Gregory</u>, 601 F.3d at 352 (quoting <u>United States v. Green</u>, 882 F.2d 999, 1003 (5th Cir. 1989)).  As noted earlier, Santos bears a heavy burden of proving ineffectiveness based upon an alleged failure to call witnesses and where the only evidence of that failure comes from the petitioner, it must be viewed with great skepticism. <u>Rabe v. Thaler</u>, 649 F.3d 305, 309-10 (5th Cir. 2011); <u>Schwander</u>, 750 F.2d at 500.  A defense attorney's failure to call a given individual as a witness is strongly presumed to be a strategic decision. <u>Strickland</u>, 466 U.S. at 689-91, 104 S.Ct. at 2065-66.

Santos' allegations fail to satisfy this formidable showing. First, other than his own self-serving statement, petitioner offers no evidence that his attorney made no attempt to contact and interview the witnesses he identifies. <u>Rabe</u>, 609 F.3d at 310.  Nor does he demonstrate that the individuals were able and willing to testify at his trial. <u>Id</u>. Turning to the issue of substance, Santos

makes no showing of what the witnesses would have testified to and how it would have been favorable to his case. Considering that there were no eyewitnesses to the actual sexual assault itself, it is difficult to imagine what the individuals could have offered that bore upon the issue of consent. In cross-examining Detective Wright, counsel was successful in emphasizing to the jury one of the individual's statements to police in which he indicated that he saw nothing going on between petitioner and the victim. Another individual's statement as to the presence of ether was proven to be untrue. On the showing made, neither deficient performance nor prejudice have been established here.

Next, petitioner alleges that counsel was deficient in failing to urge the "thirteenth juror" standard when arguing his motion for new trial and to generally be aware of <u>Crawford</u> issues. A review of the motion for new trial, however, reveals that counsel properly argued that "... the verdict is contrary to the law and the evidence", the appropriate standard of review for a motion for new trial under LSA-C.Cr.P. Art. 851(1). (St. ct. rec., vol. 2 of 7). As was noted above, because there is no transcript of the hearing on petitioner's motion for new trial or any written reasons for the trial judge's ruling, the Court has no way of knowing what standard was utilized by the judge in disposing of the motion or whether counsel effectively supplemented his motion in open court by

arguing the "thirteenth juror" standard.  No prejudice can be shown here, however, as the sufficiency of the evidence that was presented at Santos' trial was properly reviewed under the <u>Jackson</u> standard in the context of petitioner's direct criminal appeal.

In terms of awareness of potential <u>Crawford</u> issues, a review of the trial transcript reveals that counsel lodged various hearsay objections during the testimony of Detective Wright and that of Officer Rivas. (Trans. of June 19, 2007, pp. 16, 40-41; trans. of June 20, 2007, p. 18).  Given the limited options that he faced in the wake of Santos' pre-arrest statements to police, it is obvious that counsel made a strategic choice to limit his objections and to argue to the jury that some of the information in the police report had been relayed through Officer Rivas and may thus be inaccurate and that other information turned out to be untrue.  At any rate, the Court having previously determined that any <u>Crawford</u> violations were harmless in light of the overwhelming evidence of Santos' guilt, that finding compels the conclusion that petitioner has not established the requisite level of prejudice here as the result of his trial would have been no different.  <u>Green</u>, 868 F.2d at 177.

Santos' next specification of ineffectiveness is that counsel failed to retain his own interpreter for use at trial.  Other than the testimony of the victim, who was Spanish-speaking, petitioner argues that he did not fully understand the events that unfolded in

31

open court on June 19 and 20, 2007.

Essentially, the case against Santos boiled down to whose version of events the jury believed - his or the victim's - and he admits that he understood the victim's testimony. Petitioner has not demonstrated how counsel's failure to provide him with his own interpreter prejudiced the defense or prevented him from effectively conferring with his attorney. Given the overwhelming evidence of petitioner's guilt, the result of his trial would have been no different had an independent interpreter been retained. Green, 868 F.2d at 177; State v. Yanes, 40 So.3d 245, 250-51 (La. App. 5th Cir. 2010).

Finally, petitioner alleges that counsel was ineffective for failing to request a mistrial during the prosecutor's elicitation of other crimes evidence. The relevant exchange occurred during the redirect examination of the victim, as follows:

> BY MR. BATISTE:
> (Prosecutor)
>
> Q.   You stated when you were talking to the defendant's
>      attorney that you could not leave out the house?
>
> A.   No, no.
>
> Q.   Did you feel imprisoned in the house?
>
> A.   Yes.
>
> MR. COX:
> (Defense Counsel)

> Judge, I want to make an objection. My client is not charged with kidnapping or false imprisonment. He is charged with forcible rape. I don't see how this testimony is relevant.

> THE COURT:
> You can deal with it on your cross examination.

> (Trans. of June 20, 2007, p. 101).

As the trial judge effectively overruled counsel's objection to the victim's testimony, it was not unreasonable for counsel to assume that a specific request for a mistrial would have met a similar fate. Counsel is not deemed ineffective for failing to bring futile motions. <u>Murray</u>, 736 F.2d at 283. Moreover, by the time that this testimony was elicited, counsel had already brought out, during his cross-examination of Officer Rivas, that a charge of extortion that had originally been lodged against Santos had been dismissed, thus suggesting to the jury that petitioner had been wrongfully charged with at least one crime that he did not commit. (Trans. of June 20, 2007, pp. 30-31). Given the limited defense options that counsel faced, that strategy was not an unreasonable one.

## **RECOMMENDATION**

For the foregoing reasons, it is recommended that the application for federal habeas corpus relief of David Santos be dismissed with prejudice.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate

judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en banc</u>).

New Orleans, Louisiana, this _23rd_ day of ____October____, 2012.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE